RECEIVED

JAN 2 5 2007

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

FILED

JAN 3 0 2007

U. S. DISTRICT COURT
E. DIST. OF MO.
ST. LOUIS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

UNITED STATES OF AMERICA ex rel. )
RONALD EKSTRAND, )
                                                                )
             Relator, )
                                                                )   Cause No.: 4:04CV00825 RWS
v. )
                                                               )   Filed Under Seal
WELLPOINT HEALTH )   Filed In Camera
NETWORKS, INC., )   Jury Trial Requested
                                                               )
           Respondent. )

## AMENDED FALSE CLAIM ACT COMPLAINT

For his amended complaint against Wellpoint Health Networks, Inc. ("Wellpoint"), Ronald Ekstrand ("Relator") on his behalf and for the United States of America states:

1. Ronald Ekstrand is a citizen of Missouri and a former employee of RightChoice Managed Care, Inc. ("RightChoice").

2. Wellpoint is a Delaware corporation with its principal place of business in California. It is the surviving corporation after a merger with RightChoice. In January 2002, RightChoice was the largest provider of health care benefits in Missouri serving nearly 2.8 million members. It provided the majority of its benefits under the name Blue Cross and Blue Shield of Missouri. Wellpoint continues to operate Blue Cross and Blue Shield of Missouri as a wholly-owned subsidiary.

T:\Ekstrand\qui tam litigation\Pleadings\Amnended Complaint.wpd



## JURISDICTION AND VENUE

3.  Jurisdiction exists pursuant to 28 U.S.C. § 1331 as this case is brought under the False Claims Act. 31 U.S.C. §§ 3729 et seq.

4.  Venue is proper in this district pursuant to 31 U.S.C. § 3732 as a substantial part of the events or omissions giving rise to the claim occurred in this district and Wellpoint can be found in this district.

## REGULATORY SCHEME

5.  In 1959, Congress enacted the Federal Employees Health Benefits Act to allow its employees and their families to enjoy the benefits of federally funded health benefits plans. To effectuate this goal, it created the Office of Personnel Management ("OPM") to contract with qualified carriers on behalf of its employees and their families.

6.  The OPM (or before 1979, its predecessor, the Civil Service Commission) has negotiated hundreds of individualized plans for particular federal employee groups with many carriers. It has also negotiated two government-wide plans that every federal employee may join. The service benefit plan was negotiated with the Blue Cross Blue Shield Association ("the BCBSA") in contract No. CS 1039 while the indemnity benefit plan was negotiated with the Aetna Life Insurance Company. The program that implements contract No. CS 1039 is known as the Federal Employee Plan ("FEP").

7.  The BCBSA is an Illinois corporation that provides central

coordinating and administrative services for its many members including RightChoice. The BCBSA is known as the FEP carrier. RightChoice, as a BCBSA member, administers the FEP in most of Missouri and is known as the local plan. Each local plan is the underwriter of its portion of the FEP. Each local plan authorized the BCBSA to enter into contract No. CS 1039 through a Plan Participation Agreement under which the BCBSA acts as the local plans' agent and issues uniform practices and procedures for the local plans.

8. The FEP is funded by contributions from enrollees and the government. The contributions are deposited at the United States Treasury and administered by OPM. The BCBSA and the local plans are reimbursed from this fund for benefit payments, administrative expenses and other allowable retentions.

9. Under the FEP, RightChoice usually reimburses the federal employee's health care provider for covered services. The health care provider has agreed to accept a specific negotiated amount from the local plan plus a coinsurance or copayment from the employee as full payment for the covered service.

10. Federal statutes require that RightChoice's FEP rates "reasonably and equitably reflect the cost of the benefit provided." The initial rates had to be "consistent with the lowest schedule of basic rates generally charged for new group health benefit plans issued to large employers." Any rate adjustments had to be consistent with "the general practice of carriers which issue group health benefit plans to large employers." CS 1039 (and its yearly adjustments) honored this statutory mandate and contractually bound RightChoice to its statutory obligations.

T:\Ekstrand\qui tam litigation\Pleadings\Amnended Complaint.wpd 3

Furthermore, the Federal Acquisition Regulations require that the fees charged by RightChoice be allowable, allocable and reasonable. As explained below, the reimbursement fee that RightChoice charged to the OPM under the FEP were not reasonable or allowable.

## FACTUAL BACKGROUND

11. Decades ago, when RightChoice became an FEP local plan, it put the FEP on the same fee schedule as other large employers as mandated by statutes and CS 1039.

12. Around 1994, however, RightChoice implemented a bonus pool program for some of its physicians in the underwritten plans. Instead of paying out 100% of the fees earned by the physicians, a small portion would be withheld and placed in a bonus pool.

13. Near the end of the year, the money in the bonus pool would be distributed to the physicians based on performance criteria. Those physicians at higher performance levels would receive a greater portion of the bonus pool money.

14. Under this bonus pool plan, 100% of the fees would eventually be paid out; the bulk when the service was provided and the remainder as a year-end bonus.

15. When RightChoice implemented the bonus pool program, it excluded the FEP thus creating two fee schedules. For FEP payments, the physician would initially be paid 100% of the fee earned with no year end bonus. The fee schedule

that the FEP was placed on was referred to as the "alternatively funded fee schedule."

16. Upon information and belief, the alternatively funded fee schedule had rates higher than the rates charged in the bonus pool schedule. Thus, the FEP began paying rates that were higher than those that they were required to pay by contract, statute or regulation.

17. In 1996, RightChoice discontinued the bonus pool program. It did not, however, put the FEP back on the same fee schedule as the other groups. Rather, it maintained FEP on the alternatively funded fee schedule.

18. This made matters worse. The discontinuance of the bonus pool program (and the decision not to return the FEP to the same fee schedule as the other groups) created a bigger discrepancy between the fees being charged to OPM and the fees being charged to the other groups. This is true because the discontinuation of the bonus pool meant that the other groups were not paying the back end "bonus" fee.

19. Once RightChoice discontinued the bonus pool program, the OPM rates were significantly higher than the rates of the other groups. The OPM paid the higher rate of the alternatively funded schedule while the other groups would pay their regular lower rate minus that portion that previously went to the bonus pool.

20. Around April 2001, RightChoice received a reminder bulletin from the FEP Director's Office reiterating that the FEP rates cannot exceed the rates charged to similar groups.

21. Kara Smith, manager of business analysis and training for FEP, noted the rate discrepancy between the FEP and the other groups. She brought this to RightChoice's attention.

22. In May 2001, RightChoice held a meeting to discuss the concerns raised by Kara Smith. RightChoice recognized that there were concerns with the discrepancy in the billing rates and decided to investigate further. An employee memorialized the meeting in an e-mail to those in attendance. That employee received a reprimand for documenting sensitive issues in an e-mail.

23. RightChoice also expressed concern that if it were to reduce the rates of the FEP by removing them from the alternatively funded fee schedule, it would reduce the overall margins of all RightChoice business. In other words, charging the FEP a higher rate allowed RightChoice to offer more competitive rates to the other subscription groups and to make a higher margin with those groups.

24. In early June 2001, RightChoice held another meeting to discuss the issue. RightChoice decided that it was in its best business interest not to disclose the rate discrepancy. It consciously decided to continue charging FEP higher rates than other groups, in violation of OPM's contract with RightChoice (through the BCBSA) and in violation of federal statutes.

25. In late June 2001, RightChoice held another meeting to determine if the OPM had previously granted RightChoice authority to put it on the alternatively funded fee schedule. They found no such authority. Even though RightChoice knew that it was charging higher rates to OPM and that it did so without any authorization from the OPM, RightChoice again decided not to disclose the higher rates and continued to charge the higher rates and refused to reimburse the OPM for prior over billing.

26. Upon information and belief, even when RightChoice transferred the rate schedules to new billing software (FACETS), RightChoice again refused to put the FEP on the same billing schedule as the other groups thus ensuring the overbilling of the FEP.

27. As a direct result of RightChoice's intentional decision to overcharge the OPM, the United States has suffered damages in the tens of millions of dollars.

28. RightChoice knowingly caused to be presented to the United States a false or fraudulent claim for payment because, as explained above, it presented bills and rates that overcharged the United States under the FEP.

29. Likewise, RightChoice knowingly caused to be used a false record or statement to get a false or fraudulent claim paid by the United States because, as explained above, it presented bills and rates that overcharged the United States under the FEP.

30. RightChoice's actions and omissions were willful, wanton, malicious, and done with reckless indifference to the rights of the United States.

WHEREFORE, relator requests a judgment against RightChoice for treble the damages sustained by the United States plus a civil fine between $5,000 - $10,000. Relator also requests payment of his fees, costs, attorney fees, pre and post judgment interest, punitive damages and any other relief that the Court deems appropriate.

GREEN JACOBSON & BUTSCH, P.C.

By: *[signature]*

Martin M. Green #3265
Fernando Bermudez #79964
Attorneys for Relator
7733 Forsyth Boulevard, Suite 700
Clayton, Missouri 63105
314-862-6800
FAX: 314-862-1606

## CERTIFICATE OF SERVICE

I certify that on January 25, 2007, the foregoing was served electronically upon the following: Dan Spiro, Department of Justice at daniel.spiro@usdoj.gov and Suzanne Moore, U.S. Attorney's Office, Eastern District of Missouri at suzanne.moore@usdoj.gov.

*[signature]*

T:\Ekstrand\qui tam litigation\Pleadings\Amnended Complaint.wpd 8